## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| RODNEY NORDSTROM, derivatively on behalf of WORLD WRESTLING ENTERTAINMENT, INC., | CASE NO. 3:20-CV-904 |
| Plaintiff, | |
| v. | |
| VINCENT K. MCMAHON, GEORGE A. BARRIOS, MICHELLE D. WILSON, STEPHANIE MCMAHON, PAUL LEVESQUE, FRANK A. RIDDICK III, STUART U. GOLDFARB, LAUREEN ONG, ROBYN W. PETERSON, MAN JIT SINGH, JEFFREY R. SPEED, ALAN M. WEXLER, and PATRICIA A. GOTTESMAN, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| WORLD WRESTLING ENTERTAINMENT INC. | |
| Nominal Defendant. | August 14, 2020 |

## <u>VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Rodney Nordstrom ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant World Wrestling Entertainment Inc. ("WWE" or the "Company"), files this Shareholder Derivative Complaint against Defendants Vincent K. McMahon, George A. Barrios, Michelle D. Wilson, Stephanie McMahon, Paul Levesque, Frank A. Riddick III, Stuart U. Goldfarb, Laureen Ong, Robyn Peterson, Man Jit Singh, Jeffrey R. Speed, Alan M. Wexler, and Patricia A. Gottesman (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of WWE, unjust enrichment, and waste of corporate assets.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding WWE, news reports, securities analysts' reports and advisories about the Company,  information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit action filed in the U.S. District Court for the Southern District of New York captioned *City of Warren Police and Fire Retirement System v. World Wrestling Entertainment, Inc, et al.*, Case No. 20-cv-02031 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Plaintiff files this Amended Complaint in the Court under an abundance of caution as this Court has yet to rule on his pending motion to remand this case to state court filed July 31, 2020 [Dkt. No. 39].  Plaintiff reserves his right to prosecute this action and file this amended complaint in the Superior Court of Connecticut, Judicial District of Stamford/Norwalk at Stamford docket FST-CV-20-6046965-S pending the Court's decision on Plaintiff's motion to remand.  The filing of this Verified Amended Shareholder Derivative Complaint is not a concession by Plaintiff that this Court has subject matter jurisdiction over claims alleged herein and Plaintiff reserves all rights concerning this Court's jurisdiction.

## <u>NATURE OF THE ACTION</u>

1.     This is a shareholder derivative action brought in the right, and for the benefit, of WWE against certain of its officers and directors seeking to remedy Defendants' violations of law

2

that have occurred from February 5, 2019 through February 7, 2020 (the "Relevant Period") and have caused, and continue to cause, substantial harm to WWE and its shareholders, including monetary losses and damages to WWE's reputation and goodwill.

2.     WWE is an American integrated entertainment and broadcasting company that is predominately known for professional wrestling.  The Company is a widely recognized leader in global entertainment.  WWE is comprised of a portfolio of businesses that produce and distribute content 52 weeks a year to a worldwide audience.  WWE programming reaches over 800 million homes worldwide in 28 languages.  The WWE Network offers a 24/7 direct-to-consumer premium network that includes all live pay-per-views, scheduled programming, and a video-on-demand library and is presently available in more than 180 countries.

3.     This complaint stems from WWE's expansion into the Middle East and North Africa ("MENA") market.  As part of this campaign, the WWE formed a 10-year partnership with Saudi General Sports Authority ("SGSA") to host live events in Saudi Arabia and a multi-year television distribution rights agreement with Orbit Showcase Network ("OSN"), a direct broadcast satellite provider serving the Middle East and North Africa ("MENA") region.  WWE's success was contingent on the MENA region because the Company was facing declining consumer engagement in its traditional market.

4.     As detailed below, the Induvial Defendants repeatedly caused the Company to misrepresent the MENA region as a critical driver of its growth and financial success.  When, the Individual Defendants knew, or were reckless in not knowing, that the agreement with OSN would not be renewed since in or around November 2018 because OSN informed the WWE that is was shutting down its sports coverage, and, accordingly, an early termination agreement between WWE and OSN was agreed to on or around December 18, 2018.  This information went

3

undisclosed for months.  Instead, the Individual Defendants caused the Company to state that it was working to renew the MENA-region media-rights agreement (i.e., the OSN agreement) and that no further comment on the status of the "renewal" negotiations would be provided.

5.     Approximately eight months later, On July 25, 2019, the Company finally acknowledged what the Individual Defendants had long known – that the OSN agreement had ended.  To mitigate the impact of this revelation, the Individual Defendants caused Company to simultaneously disclose that it was in negotiations with the SGSA for a media-rights agreement for the MENA region and that the deal would be complete "very soon" and that they already had an "agreement in principle."  A deal for the media-rights in the MENA region was necessary for the Company to meet its full-year 2019 Adjusted Operating Income Before Depreciation and Amortization ("OIBDA") guidance of $200 million. But the representation concerning a media-rights deal with the SGSA was also not true.

6.     When the Individual Defendants' wrongful conduct came to light, the price of WWE stock fell from $100 per share to $40.24 per share on February 6, 2020, for a 60% share price decline. However, some of the Company's most senior executives – including Vincent K. McMahon – took advantage of WWE's inflated stock price to sell millions of dollars' worth of their own WWE shares during the Relevant Period.

7.     As a result of the foregoing, WWE and its chief executive officer have been named as defendants in the Securities Action by investors who allege they were damaged when they purchased WWE shares during the Relevant Period.

8.     On August 6, 2020, U.S. District Judge Jed S. Rakoff issued an order in the Securities Action denying defendants' motion to dismiss.  In the order, Judge Rakoff held that a claim for securities fraud had been stated against the WWE, Vincent K. McMahon, George A.

Barrios, and Michelle D. Wilson based upon alleged misrepresentation about the Company's media-rights contracts in the MENA region.

9.      The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company. It will likely cost the Company millions of dollars going forward.

## PARTIES

### Plaintiff

10.      Plaintiff, Rodney Nordstrom, has continuously been a shareholder of WWE since September 26, 2018.

### Nominal Defendant

11.      Nominal Defendant, WWE, is a Delaware corporation with its principal executive offices located at 1241 East Main Street Stamford, Connecticut 06902.

12.      WWE stock trades on the NYSE under the ticker symbol "WWE."

### Defendant McMahon

13.      Defendant Vincent K. McMahon ("McMahon") is, and was at all relevant times, the Company's co-founder, Chairman of the Board, Chief Executive Officer, and Chair of the Executive Committee.  According to the Company's Schedule 14A filed with the SEC on March 6, 2020 (the "2020 Proxy Statement"), Defendant McMahon beneficially owned 28,697,568  shares of the Company's common stock. Based upon the closing price of the Company's common on May 19, 2020, McMahon beneficially owns approximately $1,247,770,256.64 of WWE stock.

14.      For the fiscal year ending on December 31, 2019, Defendant McMahon received $3,503,703 in compensation from the Company. This included $1,400,000 in salary, $1,677,716

in stock awards, $406,000 in non-equity incentive plan compensation, and $19,987 in all other compensation.

15.    According to WWE's corporate website McMahon:

Vince McMahon, Chairman of the Board & Chief Executive Officer of WWE, Inc. (WWE), is a third-generation promoter who has made WWE into the global phenomenon it is today. As a pioneer in the television syndication business, a recognized television personality throughout the world, a visionary promoter and a fearless marketer, he continues to make his presence known as a leader within the broadcast and entertainment industries. In 1972, McMahon joined his father's Company, Capitol Wrestling Corporation, on a full-time basis. By 1979, the Company had syndicated programming to 30 television stations. In 1982, he purchased the Capitol Wrestling Corporation from his father and decided to take what had been a regional operation and turn it into a national venture. McMahon soon became an innovator in the cable television industry by leveraging the new technologies of pay-per-view and closed-circuit television for the first WrestleMania in 1985. Now, not only had he built a brand that people would watch in syndication, he had built the WWE into a brand that people would pay to watch. In April 2000, more than 1 million fans purchased WrestleMania X-6, at the time making it the most-watched non-boxing event in pay-per-view history. In February 2014, WWE Network, the first-ever 24/7 direct-to-consumer network, launched live in the US Under McMahon's leadership, WWE has developed into one of the most popular and sophisticated forms of global entertainment today. WWE is an integrated media and entertainment company that features a portfolio of specialized businesses that creates and delivers original content to a global audience. WWE is committed to family friendly entertainment on its television programming, pay-per-view,   digital media and publishing platforms.[1]

**Defendant Barrios**

16.    George Barrios ("Barrios") served as the Company's co-president, principal financial officer, and a member of its Board of Directors during the Relevant Period. On January 30, 2020, WWE announced that Barrios had abruptly left the Company "effective immediately." According to the 2020 Proxy Statement, Defendant Barrios owns 103,523 shares of the Company's

---

[1] See the full corporate biography of Vincent McMahon regarding his role and accomplishments at https://corporate.wwe.com/who-we-are/leadership#vincent-k-mcmahon

common stock. Based upon the closing price of the Company's common on May 19, 2020, Defendant Barrios owns $4,501,180.04. Furthermore, the Board granted Defendant Barrios continuation of salary and health insurance benefits for eighteen months, as well as his 2019 MIP bonus, valued at $935,250.

17.     For the fiscal year ending on December 31, 2019, Defendant Barrios received $1,795,855 in compensation from the Company. This included $925,211 in salary, $684,197 in stock awards, $176,295 in non-equity incentive plan compensation, and $10,152 in all other compensation.

18.     Defendant Barrios traded WWE stock on inside information before it was released to the public.  Barrios sold 40,000 shares of his personally held WWE stock for proceeds of over $3 million. As the Company's former Co-President and its principal financial officer, Barrios knew or should have known that the OSN agreement had been terminated early with no plans to salvage it.

19.     The Company's Schedule 14A filed with the SEC on March 6, 2019 (the "2019 Proxy Statement"), stated the following about Defendant Barrios:

> He has served as our Co-President since February 2018. Before that, Mr. Barrios was our Chief Strategy & Financial Officer since November 2013, and Chief Financial Officer since March 2008. Before that, he was Vice President and Treasurer of The New York Times Company since January 2007. Mr. Barrios joined The New York Times Company in 2002 as Chief Financial Officer of a subsidiary which published, among other things, The Boston Globe. Prior to that, he was President and Chief Operating Officer of Netsilicon, Inc., a publicly-held software development company, where he helped to stabilize the business prior to its merger. From 1994 to 2000, Mr. Barrios served in several senior capacities for Praxair, Inc., a large supplier of industrial gasses.

**Defendant Wilson**

20.     Defendant Michelle D. Wilson ("Wilson") served the Company's co-president and a member of its Board of Directors during the Relevant Period. On January 2020, WWE announces that Wilson had abruptly left the Company "effective immediately." According to the 2020 Proxy Statement, Defendant Wilson did not beneficially own shares in the Company because she forfeited her shares upon her departure in January 2020.  However, the Board granted Ms. Wilson a continuation of salary and health insurance benefits for eighteen months, as well as her 2019 MIP bonus, valued at $935,250.

21.     For the fiscal year ending on December 31, 2019, Defendant Wilson received $1,795,855 in compensation from the Company. This included $925,211 in salary, $684,197 in stock awards, $176,295 in non-equity incentive plan compensation, and $10,152 in all other compensation.

22.     Defendant Wilson also sold shares after learning material inside information. Wilson sold over 158,000 shares of WWE stock on August 8, 2019.  At the time of Wilson's sale, she knew that a replacement media rights deal would be delayed and used that information to liquidate her personally held shares before the share price dropped to reflect the WWE's loss of revenue from the failed media deal.

23.     The Company's 2020 Proxy Statement stated the following about Defendant Wilson:

> She has served as our Co-President since February 2018. Before that, Ms. Wilson was our Chief Revenue & Marketing Officer since November 2013, and Chief Marketing Officer since February 2009. From 2001 to 2009, she was Chief Marketing Officer of the United States Tennis Association where she was instrumental in making the US Open the highest attended annual sporting event in the world. Ms. Wilson developed innovative advertising and promotional campaigns that significantly elevated the image and awareness  of  tennis  in  the

8

United States, resulting in record television viewership and ticket sales. She was also pivotal in the implementation of several innovations for the sport, including in-stadium video screens, blue courts, instant replay and the 2004 launch of the US Open Series. From 2000 to 2001, she was Vice President of Marketing for the XFL, our former professional football league. Before that, Ms. Wilson held positions at the National Basketball Association in its domestic and international consumer products groups.

**Defendant S. McMahon**

24. Defendant Stephanie McMahon ("S. McMahon") is, and was at all relevant times, a director and Chief Brand Officer of the Company. According to the 2020 Proxy Statement, Defendant S. McMahon beneficially owned 1,977,382 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, S. McMahon beneficially owned approximately $85,976,569.40 of WWE common stock.

25. For the fiscal year ending on December 31, 2019, Defendant S. McMahon received $2,027,248 in compensation from the Company. This included $706,019 in salary, $502,146 in stock awards, $102,950 in non-equity incentive plan compensation, and $716,133 in all other compensation.

26. The 2020 Proxy Statement stated the following about Defendant S. McMahon:

She is responsible for ensuring WWE's global brand strength and growth across all lines of business, as well as overseeing WWE's community relations and pop culture strategies. Among her many contributions, Ms. McMahon has been the driving force behind WWE's women's evolution, which has given female performers an equal share of the spotlight both in and out of the ring. She is also a TV personality who appears on WWE programming. Prior to her current role, Ms. McMahon was Executive Vice President, Creative and was the first woman to lead WWE's Creative Writing, Digital Media, Talent Relations, Talent Brand Management and Live Events businesses. She was named a Stuart Scott ENSPIRE Award Honoree at the 2017 ESPN Humanitarian Awards. Adweek has included her in their list of the Most Powerful Women in Sports for the past four years and recently chose her as a 2019 Brand Genius honoree. Ms. McMahon was also named to Forbes' World's Most Influential CMOs report in 2019. In 2014, she and her husband, Paul "Triple H" Levesque, established Connor's Cure, a fund dedicated to fighting pediatric cancer. In partnership with The V Foundation and

9

Children's Hospital of Pittsburgh, Connor's Cure has raised $3 million to date. McMahon received her B.S. from Boston University in Communications and has been named a Distinguished Alumni by its School of Communications. She is a Henry Crown Fellow within the Aspen Global Leadership Network at the Aspen Institute and also an Eisenhower Fellow. She is also a member of the Board of Directors for USO Metropolitan Washington and Children's Hospital of Pittsburgh Foundation. Ms. McMahon is the daughter of Vince McMahon.

**Defendant Levesque**

27.     Defendant Paul "Triple H" Levesque ("Levesque") is, and was at all relevant times, a director and Executive Vice President, Talent, Live Events & Creative of the Company. According to the 2020 Proxy Statement, Defendant Levesque beneficially owned 126,905 shares of the Company.  Based upon the closing price of the Company's common on May 19, 2020, Levesque beneficially owned approximately $5,517,829.40 of WWE common stock.

28.     For the fiscal year ending on December 31, 2019, Defendant Levesque received $3,328,092 in compensation from the Company. This included $706,019 in salary, $502,146 in stock awards, $102,950 in non-equity incentive plan compensation, and $2,016,977 in all other compensation.

29.     The Company's 2020 Proxy Statement stated the following about Defendant Levesque:

In his current role, he oversees the Company's Talent Relations and Talent Development departments. Additionally, Mr. Levesque plays an integral role in the Company's creative process, helping shape the creative direction and storylines of WWE's programming. Mr. Levesque is revolutionizing the business with his global recruiting strategy and developmental training processes. In order to create a platform for future success, he established the Company's state of the art training facility, the WWE Performance Center, which paved the way for the WWE's third global brand, NXT. Mr. Levesque debuted as a WWE Superstar, "Triple H," in 1995 and has held the WWE Heavyweight Championship title 14 times. He has captured every major championship, headlined thousands of WWE events, and entertained millions around the world. Mr. Levesque is married to Stephanie McMahon and together they established Connor's Cure. Mr. Levesque is the son-in-law of Vincent McMahon.

10

### Defendant Riddick

30.     Defendant Frank A. Riddick III ("Riddick") is, and was at all relevant times, a director of the Company.  Since January 2020, Riddick also served the Company's Interim CFO. According to the 2020 Proxy Statement, Defendant Riddick beneficially owned 19,859 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Riddick beneficially owned approximately $863,469.32 of WWE common stock.

31.     For the fiscal year ending on December 31, 2019, Defendant Riddick received $209,769 in compensation from the Company. This included $100,170 in salary and $109,599 in stock awards.

32.     The 2020 Proxy Statement stated the following about Defendant Riddick:

> Mr. Riddick was Chief Executive Officer of FloWorks International LLC (formerly named Shale-Inland Group LLC), a leading supplier of pipe, valves and related products ("FloWorks") from September 2013 until November 2017. Prior to that, he was Chairman and then Executive Chairman of FloWorks since March   2012. Mr. Riddick is also currently a member of the Management Advisory Board of Tower Brook Capital  Partners, LP ("TowerBrook"), a private equity firm that has FloWorks in its portfolio of  companies. From  August  2009  until  joining FloWorks, Mr. Riddick was Chief Executive Officer of JMC. Steel Group, the largest independent steel tubular manufacturer in North America. Prior to that, he was a consultant to TowerBrook. Before joining TowerBrook, he served as President and Chief Executive Officer of Formica Corporation, a   manufacturer of surfacing materials, from January 2002 to April 2008. He served as President and Chief Operating Officer of Armstrong Holdings, Inc. from February 2000 to November 2001, and as Chief Financial Officer at Armstrong and its subsidiaries from   1995 to 2000. Mr. Riddick is Chairman of the Board of Apache Industrial Services, Inc., which provides scaffolding,   insulation, fireproofing and coatings. Mr. Riddick is an Emeritus member of Duke University's Fuqua School of Business Board of Visitors. Until its sale in July 2015, Mr. Riddick was a member of the board of directors, Chair of  the  Audit  Committee  and  a  member  of  the Compensation Committee of Geeknet, Inc., the   owner   and   operator   of ThinkGeek, an online retailer. Mr. Riddick is also a former director  of  GrafTech International Ltd, a manufacturer of graphite and carbon products,  as    well    as related technical services.

**Defendant Goldfarb**

33.    Defendant Stuart U. Goldfarb ("Goldfarb") is, and was at all relevant times a director of the Company.  Goldfarb is also a member of the Company's Audit Committee and Governance & Nominating Committee. According to the 2020 Proxy Statement, Defendant Goldfarb beneficially owned 24,605 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Goldfarb beneficially owned approximately $1,069,825.40 of WWE common stock.

34.    For the fiscal year ending on December 31, 2019, Defendant Goldfarb received $192,269 in compensation from the Company. This included $82,670 in salary and $109,599 in stock awards.

35.    The 2020 Proxy Statement stated the following about Defendant Goldfarb:

Since January 2014, Mr. Goldfarb has been Co-founder and Partner of Melo7 Tech Partners, L.L.C., which was founded by Carmelo Anthony and Mr. Goldfarb to invest in and develop opportunities primarily in early stage digital media, consumer internet and    technology ventures. Prior to this, from January 2012, Mr. Goldfarb was President of Fullbridge, Inc., a provider of an accelerated, rigorous business education program. From June 2011 until January 2012, Mr. Goldfarb was President and Chief Executive Officer of Atrinsic, Inc., a marketer of direct-to-consumer subscription products and an Internet search marketing agency. Mr. Goldfarb served as a director of Atrinsic from January 2010 until December 2012. In June 2012, Atrinsic filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the US Bankruptcy Court for the Southern District of New York. The filing was precipitated by Atrinsic's cessation of certain businesses and its inability to raise financing. From 2001 to 2009, Mr. Goldfarb was President and Chief Executive Officer of Bertelsmann Direct NA. Under his leadership, the company grew to be the world's largest direct marketer of  music,   DVDs   and books, with household brands such as Columbia House, BMG Music, Doubleday Book Club, Book-of-the-Month-Club and cdnow.com. Prior to that, Mr. Goldfarb was President and Chief Executive Officer of bol.com, Bertelsmann's premier online retailer of books and music, doing business in 18 European and Asian countries. Before joining Bertelsmann, he was Vice Chairman of Value Vision International, a cable TV home shopping and e-commerce company. He was formerly Executive Vice President, Worldwide Business Development at NBC.

**Defendant Ong**

36.     Defendant Laureen Ong ("Ong") is, and was at all relevant times, a director of the Company. Ong is also Chair of the Company's Compensation Committee and a member of the Company's Governance & Nominating Committee. According to the 2020 Proxy Statement, Defendant Ong beneficially owned 12,957 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Ong beneficially owns approximately $569,848.86 of WWE common stock.

37.     For the fiscal year ending on December 31, 2019, Defendant Ong received $187,269 in compensation from the Company. This included $77,670 in salary and $109,599 in stock awards.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Ong:

> She is a consultant in the media industry. From April 2010 to October 2013, Ms. Ong   served as President, Travel Channel L.L.C., a subsidiary of Scripps Networks Interactive, Inc., which operates a television network focusing on travel entertainment. From March   2007 to October 2009, she was Chief Operating Officer of Star Group Limited, which produces, broadcasts and distributes television programming via satellite in Asia. From   April 2000 to April 2007, Ms. Ong was President of National Geographic Television, during which time she was the chief architect of the launch of its cable television network. Prior to that, she was a senior executive in several sports and media   companies. Ms. Ong is a member of the Board, Compensation Committee and Nominating and Corporate Governance Committee of Presidio Property Trust, a contrarian real estate investor focused on out-of-the mainstream properties. She is also on the Board of Charter 100, an organization of Women Executives in Phoenix.

**Defendant Peterson**

39.     Defendant Robyn Peterson ("Peterson") is and was at all relevant times, a director of the Company. Peterson has served as the Chair of the Compensation Committee and is a member of the Governance & Nominating Committee. According to the 2020 Proxy Statement, Defendant

Peterson beneficially owned 10,853 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Peterson beneficially owned $471,888.44 of WWE common stock.

40.     For the fiscal year ending on December 31, 2019, Defendant Peterson received $187,269 in compensation from the Company. This included $77,670 in salary and $109,599 in stock awards.

41.     The Company's 2020 Proxy Statement stated the following about Defendant Peterson:

> Mr. Peterson has been Chief Technology Officer and Senior Vice President of CNN since  December 2018 and, before that since February 2018, he was Head of Products and Platforms at Turner. From May 2011 until January 2018, Mr. Peterson was Chief Technology Officer of Mashable, Inc., a leading source of news information and resources for the connected generation. From January 2011 to March 2011, Mr. Peterson was Vice President of Product, News and Info for AOL, responsible for product strategy and development of the news, finance and sports sites until AOL's acquisition of the Huffington Post. From March 2010 to January 2011, Mr. Peterson was Product Director    for Next Issue Media LLC, a company formed by five major U.S. publishers to develop, market   and   deliver interactive digital editions of magazines. Prior to that, from November 2008, Mr. Peterson was Vice President, Technology and Product for NBC. Universal, Inc. From 2001-2004, and from 2005-2008, Mr. Peterson was an executive at Ziff Davis Media, where he was Chief Technology Officer. Mr. Peterson was previously involved in other digital companies since 1998.

**Defendant Singh**

42.     Defendant Man Jit Singh ("Singh") is, and was at all relevant times, a director of the Company.  Singh is also a member of our Audit Committee. According to the 2020 Proxy Statement, Defendant Singh beneficially owned 1,529 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Singh beneficially owned $66,480.92 of WWE common stock.

43.     For the fiscal year ending on December 31, 2019, Defendant Singh received $172,585 in compensation from the Company. This included $62,986 in salary and $109,599 in stock awards.

44.     The 2020 Proxy Statement stated the following about Defendant Singh:

> He is a seasoned media executive with global experience across product innovation, growth strategy, and business development. Mr. Singh was with Sony Pictures Entertainment from 2007 until March 2018, where he was most recently President, Home Entertainment. Prior to being President, Mr. Singh oversaw Sony's Multi Screen Media subsidiary in India, where he was instrumental in moving into the sports market with the launch of television and digital offerings. Prior to joining Sony, Mr. Singh was a senior executive at several technology, staffing, management consulting and consumer product companies.

**Defendant Speed**

45.     Defendant Jeffrey R. Speed ("Speed") is, and was at all relevant times, a director of the Company.  Speed is also Chair of the Audit Committee and a member of the Company's Compensation Committee. According to the 2020 Proxy Statement, Defendant Speed beneficially owned 18,520 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Speed beneficially owned $805,249.60 of WWE common stock.

46.     For the fiscal year ending on December 31, 2019, Defendant Speed received $209,769 in compensation from the Company. This included $100,170 in salary and $109,599 in stock awards.

47.     The 2020 Proxy Statement stated the following about Defendant Speed:

> He served as Executive Vice President and Chief Financial Officer of Six Flags, Inc., the world's largest regional theme park operator, from April 2006 until October 2010. In June 2009, Six Flags, Inc. filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code in the US Bankruptcy Court for the District of Delaware, and it emerged from those proceedings in May 2010. Prior to joining Six Flags, Mr. Speed spent approximately 13 years with The Walt Disney

Company, serving from 2003 until 2006 as Senior Vice President and Chief Financial Officer of Euro Disney S.A.S., the publicly-traded operator of the Disneyland Resort Paris, the number one tourist destination in Europe. Prior to that, Mr. Speed spent approximately nine years with the public accounting firm of Price Waterhouse (now PwC).

**Defendant Wexler**

48.     Defendant Alan M. Wexler ("Wexler") is, and was at all relevant times, a director of the Company.  Wexler is also a member of the Company's Compensation Committee. According to the 2020 Proxy Statement, Defendant Wexler beneficially owned 1,529 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Speed beneficially owns approximately $66,480.92 of WWE common stock.

49.     For the fiscal year ending on December 31, 2019, Defendant Speed received $171,647 in compensation from the Company. This included $62,048 in salary and $109,599 in stock awards.

50.     The Company's 2020 Proxy Statement stated the following about Defendant Wexler:

> From February until June 2019, Mr. Wexler was Chairman of Publicis Sapient. Prior to that, he was CEO of Publicis Sapient since January 2018, and, prior thereto, CEO of Sapient Razorfish and Co-CEO of Publicis Sapient. He was President and then CEO of Sapient Nitro for several years prior to that and has been with Sapient Corporation, which was acquired by Publicis Group, in several other senior leadership positions for an aggregate of nearly 20 years. Publicis Sapient has offices globally, 17,000 employees and cultivates key agency relationships with a roster of blue-chip brands and advises clients on the impact of digital on their businesses. Mr. Wexler has been working at the intersection of creative, digital and technology for more than 30 years. He has extensive experience in the advertising and branding space.

**Defendant Gottesman**

51.     Defendant Patricia A. Gottesman ("Gottesman") is, was at all relevant times, a director of the Company. Gottesman is also Chair of the Governance & Nominating Committee.

According to the 2020 Proxy Statement, Defendant Gottesman beneficially owned 15,000 shares of the Company. Based upon the closing price of the Company's common on May 19, 2020, Gottesman beneficially owns approximately $652,200 of WWE common stock. According to the 2020 Proxy Statement, Gottesman will step down from the Board at the Company's 2020 Annual Meeting.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors and/or fiduciaries of WWE and because of their ability to control the business and corporate affairs of WWE, the Individual Defendants owed WWE and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage WWE in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of WWE and its shareholders to benefit all shareholders equitably.

53.     Each director and officer of the Company owes WWE and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

54.     As fiduciaries of WWE, The Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

55.     The officers and directors of WWE were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

56.     Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care,

17

and diligence in the management and administration of the affairs of the Company. As WWE's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

57.     The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

58.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things the Individual Defendants were required to:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Connecticut, the United States, and pursuant to WWE's Code of Conduct and internal guidelines;

(b)     conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how WWE conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a

reasonable inquiry in connection in addition to that, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic, accurate records and reports of the business and internal affairs of WWE and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that WWE's operations would comply with all laws and WWE's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over Company's officers and employees' public statements and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed  WWE's and the shareholders the duty of loyalty requiring that each favor WWE's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and WWE and were at all times acting within the course and scope of such agency.

61.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with WWE.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WWE.

A.     **WWE's Code of Business Conduct**

63.     The Code of Business Conduct states that "WWE is committed to conducting its business fairly, honestly and in accordance with the law."

64.     The Company's Code of Business Conduct requires its employee not to make false and/or misleading statements, specifically:

> In the course of conducting business on the Company's behalf, WWE Personnel shall not make any false or misleading statement that the WWE Personnel knows to be false or misleading or that with reasonable diligence the WWE Personnel should have known to be false or misleading. If a WWE Personnel finds that any statement made was unintentionally false or misleading or if a WWE Personnel believes any misunderstanding has occurred, he or she should promptly correct any such statement or misunderstanding. The resulting trustworthiness is essential to good business relationships.

65.     Pursuant to the Company's Code of Business Conduct, its employees are prohibited from insider trading, specifically:

> The term "insider trading" refers to the practice of trading in securities while in possession of material non-public information, a practice which is prohibited under federal law. Any WWE Personnel trading while in possession of material information which he or she has reason to believe is not publicly available is acting contrary to Company policy and may be held liable for insider trading. Directly or indirectly "tipping" this information to another person who trades is also a violation of this policy. Information will be deemed "material" if it would be likely to influence a reasonable investor's decision to buy, sell or hold securities. Any

20

information about the advances, set-backs or over-all business plan of WWE or its business partners should be considered material. "Non-public" information includes any information that has not been made available to the public through a press release or a filing with the Securities and Exchange Commission. WWE Personnel with information about WWE or its business partners should consider the information "non-public" until the second full trading day following the wide-spread disclosure of that information.

66.     The Company's Code of Business Conduct explains to its employees concerning

reporting any violations, that:

WWE Personnel must comply with all applicable laws and all Company policies, whether or not required by law. Violations will be grounds for termination. When in doubt, WWE Personnel have the responsibility of seeking clarification from their supervisors or, if necessary, the Business and Legal Affairs Department. Any violations of law or any of the Company's other policies must be reported, and it is a violation of Company policy not to make such reports. Reports may be written or oral; they should be clear and concise, but as detailed as is helpful to understand the issues. Reports may be made anonymously, if necessary. However, please bear in mind that anonymous reports are often more difficult to verify, and therefore may be less useful to the Company.Reports of violations may be made (i) to the employee's direct or indirect supervisor; (ii) to any officer(s) of the Company; (iii) to the Company's Controller; or (iv) to the Company's Audit Committee (see Annual Stockholders' Report or the Company's proxy statement for current members of the committee). Reports of violations may also be made by calling 1-866-737-6815. These reports will be monitored by appropriate internal resources as well as the Chairs of our Governance and Nominating and Audit Committees. WWE Personnel may report concerns regarding questionable accounting or auditing matters to our independent Audit Committee at 1-866-737-6815. If specifically requested, disclosure will be kept confidential to the full extent allowed by law.

67.     Lastly, the Company's Business Code of Conduct encourages its employees to

engage in fair-dealing.

All WWE Personnel should endeavor to deal fairly with the Company's customers, suppliers and competitors and with other WWE Personnel. WWE Personnel should avoid taking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing          practice.

68.     In violation of the Company's code of ethics, the Individual Defendants conducted

little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty.  In violation of the Company's code of ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business honestly and ethically, and properly report violations of the Company's code of ethics.

**B.      Additional Duties of the Audit Committee Members**

69.      The Audit Committee Charter states, in relevant part:

The Audit Committee will primarily fulfill its responsibilities by carrying out the activities enumerated in this Section below. The Audit Committee will report regularly to the Board regarding the execution of these duties and responsibilities, including, without limitation, its (i) evaluation of the independent auditors; (ii) the quality and integrity of the Company's financial statements; (iii) the Company's compliance with legal and regulatory requirements; (iv) the qualifications, performance and independence of the Company's independent auditors; and (v) the performance of the internal audit function. The Audit Committee has the authority, without seeking Board approval, to, and shall, obtain advice and assistance from outside legal, accounting and/or other advisors as deemed appropriate by the Committee to fully execute its duties and responsibilities. The Company shall provide appropriate funding, as determined by the Audit Committee, for compensation for the independent auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attestation services and for any outside legal, accounting and other advisers that the Audit Committee may choose to engage and for ordinary administrative expenses of the Audit Committee that are necessary or appropriate in carrying out its duties. None of the Committee's responsibilities may be delegated to any other committee of the Board.

The Audit Committee shall:

Documents/Reports/Accounting Information Review

…

4.Review and discuss earnings press releases with management, including the type and presentation of information, paying particular attention to any use of "pro-

forma", "adjusted" or other information which is not required by generally accepted accounting principles ("GAAP").

…

Ethical Compliance, Legal Compliance and Risk Management

26. Review and approve a Code of Business Conduct (the "Code") and ensure that management has established a system to enforce this code. Ensure that the Code is in compliance with all applicable rules and regulations.

27. Review management's monitoring of the Company's compliance with the organization's Code, and ensure that management has the proper review system in place to ensure that Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

28. Review, with the organization's internal and outside legal counsel, legal compliance matters including corporate securities trading policies.

29. Review, with the organization's internal and outside counsel, any legal matter that could have a significant impact on the organization's financial statements.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the

Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

72.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

73.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

74.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and WWE and was at all times acting within the course and scope of such agency.

## BACKGROUND

75.     The Company was incorporated on February 21, 1980, and is headquartered in Stamford, Connecticut, with satellite offices in New York, Los Angeles, London, Mexico City, Mumbai, Shanghai, Singapore, Dubai, Munich, and Tokyo. On or about October 19, 1999, WWE stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "WWE."

76.     WWE engages in the sports entertainment business in North America, Europe, the Middle East, Africa, the Asia Pacific, and Latin America. As in other professional wrestling promotions, WWE shows are not legitimate contests but are entertainment based and feature storyline-driven, scripted, and choreographed matches, though matches often include moves that can put performers at risk of injury, even death, if not performed correctly.  Since the 1980s, WWE has publicly branded its product as sports entertainment, acknowledging the product's roots in competitive sport and dramatic theater.

77.     WWE personnel consist of professional wrestlers, managers, play-by-play and color commentators, ring announcers, interviewers, referees, trainers, producers, scriptwriters, and various other positions.  As of February 2019, WWE had 915 employees, excluding its hundreds of "Superstars" and "NXT" talent, which it considers independent contractors. Main roster personnel is assigned to one of three primary brands – *Raw*, *SmackDown*, and *NXT* – and primarily appear on Monday Night *Raw*, Friday Night *SmackDown*, or *NXT*, while cruiserweight wrestlers appear on 205 Live and wrestlers from *NXT UK* appear on their own weekly show.  Personnel can also appear on WWE's other weekly television programming, as well as on pay-per-view and untelevised live events.

78.     WWE reports revenues in three segments: Live Events, Media, and Consumer Goods (merchandise). Live Events provides ongoing content for WWE's media platforms and

Live Event segment revenues consist primarily of ticket sales, including primary and secondary distribution, revenues from events for which WWE receives a fixed fee, as well as the sale of travel packages associated with the Company's global live events. The Media segment reflects the production and monetization of long-form and short-form media content across various platforms, including WWE Network, pay television, digital and social media, as well as filmed entertainment. Across these platforms, revenues principally consist of content rights fees, subscriptions to WWE Network, and advertising and sponsorships. Media net revenues were $683.4 million, $535.6 million, and $476.9 million, representing 73%, 67%, and 65% of WWE's total net revenues in fiscal years 2018, 2017, and 2016, respectively.

79.     The Kingdom of Saudi Arabia is a country in Western Asia constituting the bulk of the Arabian Peninsula. The state is an absolute monarchy ruled by the Al Saud royal family. Beginning in 2014, the Saudi government began hosting several WWE live events in Saudi Arabia. The events were very lucrative for WWE and later expanded as part of Saudi Arabia's social and economic reform program, Saudi Vision 2030.

80.     OSN is a direct-broadcast satellite provider serving the MENA region. OSN has traditionally offered popular entertainment content such as movies, sporting events, and various TV shows from major U.S. and international networks and studios, in addition to local versions specifically for the MENA region. The OSN network is owned and operated by Panther Media Group Limited, a joint venture between a Kuwait-based company and Mawarid Holding, a private Saudi investment company.

81.     On July 21, 2014, WWE and OSN announced a five-year exclusive media agreement, stating that "WWE's flagship television program Monday Night Raw [would] air live on OSN, WWE's exclusive pay-TV partner in the Middle East and North Africa through 2019."

26

According to a press release WWE and OSN put out that day, "[u]nder this new agreement, fans [could] now enjoy all of WWE's programming, including Raw, SmackDown®, NXT™ and Main Event™, as well as WWE pay-per-view events including WrestleMania® and SummerSlam®, in one place on OSN Sports 2 HD." The release further stated in pertinent part as follows:

> OSN and WWE have a long-standing relationship and we are very excited to be taking that to the next level," said Andy Warkman, OSN's VP of Sport & Production. "For the first time in the region, all core WWE programming will be available in one place, making OSN the home of WWE, reaching an audience across more than 20 countries. This deal furthers our commitment to bringing our customers the best content."

> WWE is very excited to be extending and expanding its deal with OSN in the Middle East," said Carlo Nohra, General Manager of WWE Middle East. "OSN hosts some of the very best international entertainment and sports programming and is the perfect home for WWE programming. Together with OSN, we will continue to grow our TV, pay-per-view, live event and consumer products businesses across the Middle East."

82. On February 15, 2015, WWE and OSN jointly issued a release stating they were adding WWE Network to the five-year agreement as part of an expanded partnership.

83. In the years that followed, expansion into the MENA region became an increasingly important part of WWE's business plans and growth initiatives, as the Middle East grew to become the Company's second-largest market by monetization.

84. Towards this end, in March 2018, the Saudi Press Agency announced that WWE and the SGSA had signed a 10-year multi-platform partnership with WWE to hold wrestling events in the country. Analysts estimated the partnership was worth about $500 million to WWE. A press release issued by WWE and the SGSA described the deal as follows:

> The Saudi General Sports Authority in partnership with WWE will present the *Greatest Royal Rumble* event at the King Abdullah Sports City in Jeddah, Saudi Arabia on Friday, April 27. For the first time ever, the *Royal Rumble* match will feature 50 WWE Superstars. As part of this historic event, fans will see WWE Superstars John Cena™, Triple H™, Roman Reigns™, AJ Styles™, Braun

27

Strowman™, The New Day™, Randy Orton™, Bray Wyatt™ and Shinsuke Nakamura™, among others.

*       *       *

Ticket and broadcast information will be available in the coming weeks. This event is part of a 10-year strategic multiplatform partnership in support of Vision 2030, Saudi Arabia's social and economic reform program.

"*The Greatest Royal Rumble* will be a spectacle of historic proportions," said Vince McMahon, WWE Chairman & CEO. "Our partnership with the Saudi General Sports Authority reflects a long-term commitment to present WWE's world-class entertainment to a global audience on a grander scale than ever before."

85.     The first event held under the Saudi partnership was the *Greatest Royal Rumble*, which took place on April 27, 2018, at the King Abdullah International Stadium in Jeddah, Saudi Arabia. WWE hailed the event as the largest "outside the U.S. in the past 16 years" and a major contributor to the Company's "record" second quarter 2018 results. Speaking during an earnings call with investors, Defendant Wilson stated that, "[a]s added proof of the compelling nature of our content, last Friday, we held one of our largest events ever outside the United States, with a sold-out crowd at the Greatest Royal Rumble event in Jeddah, Saudi Arabia." She continued, stating that "[t]he April 27th event marked the successful beginning of a 10-year partnership with the Kingdom of Saudi Arabia."

86.     The WWE viewed business dealings with the Saudi government as a lucrative entrance point into the MENA region and a key pillar of its business plans.  For example, in discussing the Company's "record" second quarter 2018 results, Defendant McMahon stated, "'We're pleased with our continued success in increasing the monetization of WWE content globally.'" He claimed this "'success is evidenced by the development of a 10- year strategic partnership with the Saudi General Sports Authority,'" which he listed as among the Company's most prestigious international initiatives.

28

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

87.     On February 7, 2019, the Individual Defendants caused the Company to issue a press release announcing its fourth quarter and fiscal 2018 ("4Q18" and "FY18") financial results for the period ended December 31, 2018, and providing fiscal year 2019 ("FY19") financial guidance. The release stated that during FY18, WWE had successfully "[p]roduced new, large-scale international events (*Greatest Royal Rumble, Crown Jewel, and Super Show-Down*) and compelling content across platforms." Discussing the Company's then-present business metrics and financial prospects, the release highlighted the Company's monetization of international markets, including Saudi Arabia. It stated in pertinent part as follows:

> "In 2018, WWE generated the highest level of revenue and earnings in the Company's history by leveraging our brand strength to increase the monetization of our content worldwide," stated Vince McMahon, Chairman and Chief Executive Officer. "Our long-term growth strategy will continue to focus on content creation, digitization and international development."

> George Barrios, WWE Co-President, added "We increased revenue by nearly $130 million, and achieved a record level of Adjusted OIBDA and network subscribers. We expect to balance 2019 revenue growth with investment in strategic areas that extend the moat around our business, enabling us to continue our business transformation and maximize shareholder value."

*See* https://corporate.wwe.com/~/media/Files/W/WWE/press-releases/2019/q4-2018-pr.pdf.

88.     The press release also stated that WWE expected to achieve "Adjusted OIBDA of at least $200 million" for the year, stating in pertinent part:

**Financial Outlook 2019**

In 2019, WWE management expects the Company to achieve another year of record revenue of approximately $1.0 billion and, as previously communicated, is targeting Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).

Management believes that increasing fan engagement over the next few years can enhance WWE's brand value and strengthen the Company's ability to optimize the value of its content over the long-term. Given the potential magnitude of this opportunity and its importance to long-term growth, the Company plans to continue to invest in content, digitization and international development.

*       *       *

Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted OIBDA of at least $100 million in the fourth quarter.

*Id*.

89.     During the earnings call to discuss WWE's 4Q18 results, Defendant McMahon stated: "Our international revenue surpassed $300 million for the first time in history . . . [as] we performed large-scale record-breaking events, [including] *Greatest Royal Rumble ...* " (Footnote omitted.)     *See*     https://www.fool.com/earnings/call-transcripts/2019/02/07/world-wrestling-entertainment-inc-wwe-q4-2018-earn.aspx.

90.     Similarly, also on the earnings call, Defendant Barrios stated: "[I]n 2018, we effectively executed our strategy, leveraged our brand to increase the monetization of our content worldwide and across multiple platforms . . . with international markets surpassing $300 million for the first time in our history." He also tied the $200 million adjusted OIBDA projection to the Company's continued success and efforts in the Middle East region. He stated in pertinent part:

So if we're moving revenue at a faster clip than we anticipate, we may put some additional investments in the fourth quarter but all geared towards hitting that $200 million in OIBDA for the year. And as we talked about in the prepared remarks, it really is on those areas of continuing to drive content, especially the localization of our current content and potentially local content in some of our key international markets. We just think that's a big addition to the flywheel that we've built. We'll continue to invest in digital products and digitization kind of writ large, the network being kind of one of the largest manifestations of that. And we'll continue to put more people, more kind of functional roles in our key markets, in India, in the Middle East, in China, in Latin America. So that's what we're going to do. As we said again in the prepared remarks, we think there's a long tail for us in the monetization of content, both in the U.S. and outside the U .S. and we think the opportunity is one we want to make sure we take advantage of. In terms of the rights

renewal process outside the U.S., obviously, there's a lot of key markets that we're still working on, U.K., India, China, Latin America, the Middle East. We'll announce those as the deals get done or shortly thereafter.

*Id*.

91.     Despite the statements to the contrary, such as the above, there was no chance of a renewal in the Middle East because the agreement with OSN – the only pending media-rights agreement in that region – had already been terminated. According to Carlo Nohra, Vice President and General Manager of WWE – Middle East, in September 2018, WWE sent OSN a "Notice of Material Breach" based on the delinquent payments. In November 2018, OSN sent WWE an unsolicited settlement proposal. Mr. Nohra further explained that on December 18, 2018, WWE and OSN entered into a settlement agreement under which WWE and OSN agreed to the early termination of the OSN media rights agreements, effective March 2019.

92.     On February 7, 2019, WWE also filed its FY18 Annual Report on Form 10-K with the SEC ("FY18 10-K"). The FY18 10-K emphasized the continuing importance of the Company's Saudi business dealings, stating in pertinent part as follows:

**Customers**

Our customers include content distributors of our media content through their networks and platforms, fans who purchase tickets to our live events, purchase our merchandise at venues or online through our eCommerce platforms and subscribers to WWE Network, advertisers and sponsors, consumer product licensees, and film distributors/buyers. As noted elsewhere, we have several important partners, including NBCU who carries the domestic television distribution of Raw and, until October 2019, SmackDown Live, the Fox Network which beginning October 2019 will begin distributing SmackDown Live, and the General Sports Authority of the Kingdom of Saudi Arabia who, among other things, hosts our live events in the Middle East.

93.     In addition, the FY18 10-K emphasized the importance of the Saudi relationship, stating that, "[i]n 2018, WWE embarked on an important long-term partnership with the General

31

Sports Authority of the Kingdom of Saudi Arabia for, among other things, a series of live events in that region." It also stated that WWE had "an important partnership with the General Sports Authority of the Kingdom of Saudi Arabia" that was then "expected to continue to constitute a significant percentage of [WWE's] revenues."

94.     Also on February 7, 2019, the Individual Defendants caused the Company to issue a press release "announc[ing] that the Company's Board of Directors ha[d] authorized a stock repurchase program of up to $500 million of the Company's common stock." The release quoted Defendant Barrios (who would ultimately sell over $3.3 million worth of his WWE stock that same month) as stating in pertinent part as follows:

> "The authorization of a stock repurchase program underscores our commitment to the Company's shareholders. The decision is supported by WWE's strong financial performance and demonstrates our confidence in the Company's future. We believe we can continue to invest for future growth, maintain financial flexibility and return excess capital to shareholders, all of which should keep us on the path toward building long-term value."

95.     On February 26, 2019, Defendant Barrios presented to investors at the Morgan Stanley Technology, Media & Telecom Conference.  He stated that the negotiations on the MENA distribution rights deal were "ongoing," with a target to "get that locked down by the middle of the year." He also stated that the "Middle East is now #2 in 2018 after the U.S." in terms of gross monetization and "important for us strategically because our distribution partners for the core content is a key part of the value creation for the business, important for us financially."

96.     The statements from the press release, earnings call, and FY18 10-K referenced above were materially false and misleading because they failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants failed to disclose that OSN had informed the WWE in November 2018 that it would not renew its media rights agreement and

the parties had entered into a settlement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of WWE's content in its key MENA market was impossible, and forcing the WWE to seek a new media partner for the distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

### THE TRUTH BEGINS TO EMERGE

97.    On April 25, 2019, WWE reported disappointing first-quarter 2019 ("1Q19") financial results, revealing that revenues had fallen year over year on notable declines in the live events and consumer products segments. In addition, WWE announced lower than expected guidance for its second-quarter of 2019 ("2Q19") but maintained full-year guidance of "at least $200 million" in adjusted OIBDA. The Company also revealed a $24 million uptick in accounts receivables but claimed that this reflected the ordinary timing of different events. WWE blamed the absence of certain "Super Stars" for the poor performance, but several analysts tied the disappointing results and guidance to potential delays in scheduling a live Saudi event.

98.    On this news, WWE's stock price fell $13.12 per share, or 13.12%, to close at $85.38 per share on April 25, 2019, on an unusually high volume of more than 10 million shares traded. However, by continuing to conceal the true status of the media rights deals and reaffirming the Company's fiscal 2019 ("FY19") financial guidance, Defendants maintained the artificial inflation in the price of WWE securities.

99.    Additionally, Defendants continued to provide false and misleading statements to the market in a 1Q19 press release.  The 1Q19 press release failed to disclose the breakdown of the critical MENA media-rights deals that had occurred behind the scenes and that threatened the Company's business and prospects. The press release stated in pertinent part:

**Second Quarter 2019 Business Outlook**

For the second quarter of 2019, the Company estimates Adjusted OIBDA of $19 million to $24 million. This range of results represents a year-over-year decline in Adjusted OIBDA driven by increases in fixed costs, including the timing of strategic investments.

**Financial Outlook 2019**

In 2019, WWE management is targeting another year of record revenue of approximately $1.0 billion and, as previously communicated, Adjusted OIBDA of at least $200 million, which would also be an all-time record (up at least 12% from Adjusted OIBDA of $178.9 million in 2018).

Achieving the targeted range of full year results assumes substantial revenue, which supports Adjusted OIBDA of at least $100 million in the fourth quarter. (Footnote omitted.)

https://corporate.wwe.com/investors/news/press-releases/2019/04-25-2019-133037088.

100.    On July 25, 2019, WWE reported its financial results for 2Q19, ending June 30, 2019. The release stated that "[d]uring the quarter, WWE continued to demonstrate success in staging large-scale, action-packed events for its fans, including . . . *Super ShowDown* in Jeddah, Saudi Arabia." The *Super ShowDown* event had occurred on June 7, 2019, and the release touted the event as a major driver of WWE's results and portrayed the Company's successful operations in Saudi Arabia as a pillar of its FY19 financial guidance. The press release stated in pertinent part as follows:

George Barrios, Co-President, added "In the quarter, our earnings exceeded guidance, however we anticipate a portion of this to reverse and we continue to target full-year Adjusted OIBDA of at least $200 million. The guidance presupposes the staging of a second large scale international event and the completion of a media rights deal in the MENA region. As we optimize near-term results, we will continue to focus on content creation, localization and digitization, including the evolution of our direct-to-consumer network, to drive long-term growth."

**Second-Quarter Consolidated Results**

\*      \*      \*

Adjusted OIBDA (which excludes stock compensation) was $34.6 million as compared to $43.5 million and the Company's Adjusted OIBDA margin was 13% as compared to 15% in the prior year quarter, respectively. The current period results exceeded guidance primarily due to enhanced revenue recognized in conjunction with the Company's recent event in Saudi Arabia, which is expected to reverse in connection with an anticipated fourth quarter event in that country.

\*      \*      \*

Cash flows used in operating activities were $7.6 million as compared to $74.2 million of cash generated in the prior year quarter driven by unfavorable changes in working capital, which was primarily related to the timing of the Saudi event in June as the prior year event was held in April, as well as lower operating performance.

*See*  https://corporate.wwe.com/investors/news/press-releases/2019/07-25-2019-133118093.

101. The release also stated that WWE had reached non-binding "agreements in principle with the Saudi General Sports Authority on the broad terms" for a second large scale live event and a media rights deal for the MENA region. It stated in pertinent part:

**Financial Outlook 2019**

The Company reiterated its full year guidance, which targets revenue of approximately $1 billion and Adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in WWE's engagement metrics, a second large scale event in the MENA region, and the completion of a media rights deal in the MENA region. The Company believes it has agreements in principle with the Saudi General Sports Authority on the broad terms for the latter two items; however, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or that engagement does not improve as assumed. The Company has evaluated these potential outcomes and currently believes that the most likely downside to its

Adjusted OIBDA would be approximately $10 million to $20 million below its current outlook.  The Company's full year guidance reflects strong fourth quarter

35

results with substantial revenue growth from both the Company's new content distribution agreements in the U.S., which become effective in that period, and the aforementioned media rights deal in the MENA region. (Footnote omitted.)

*Id.*

102.    That same day, Defendants held an earnings call to discuss WWE's 2Q19 results in which Defendants McMahon, Wilson, and Barrios participated. During his prepared remarks, Defendant McMahon stated: "*Obviously, there's India and MENA to do, and we are going to be close to announcing those deals very soon*." See https://www.fool.com/earnings/call-transcripts/2020/04/24/world-wrestling-entertainment-inc wwe-q1-2020-earn.aspx.

103.    Similarly, Defendant Barrios stated that "[d]uring the quarter, we achieved adjusted OIBDA of $34.6 million, which exceeded our guidance, primarily due to enhanced revenue recognized in conjunction with our recent event in Saudi Arabia. That enhanced revenue is expected to reverse in connection with an anticipated fourth quarter event in that country."

*Id.*

104.    During her prepared remarks, Defendant Wilson stated: "During the quarter, we continue[d] to successfully stage large-scale events for our fans, including . . . *Super ShowDown* in Jeddah, Saudi Arabia." *Id.*

105.    Later in the call, Defendant Barrios provided more color on the Company's guidance and the positive impact of the SGSA relationship, stating in pertinent part as follows:

For the full year, we continue to target record revenue of approximately $1 billion and adjusted OIBDA of at least $200 million. This guidance assumes continued improvement in our engagement metrics, a second large-scale event in the MENA region and the completion of a media rights deal in the MENA region. We believe we have agreements in principles with the Saudi – in principle with the Saudi General Sports Authority on the broad terms for the latter 2 items. However, this understanding is nonbinding. It is possible that either or both of these business developments do not occur on expected terms and/or the engagement does not

36

improve as assumed. We valued these potential outcomes and currently believe that [the] most likely downside to our adjusted OIBDA would be approximately $10 million to $20 million below our current outlook. Our full year guidance reflects strong fourth quarter results, substantial revenue growth from both our new content distribution agreements in the U.S. which become effective in that period, and the aforementioned media rights deal in the MENA region.

*Id*.

106.    The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business and operations. Specifically, Defendants failed to disclose that OSN  informed the WWE in November 2018 that it would not renew its media rights agreement and the parties had entered into a settlement agreement dated December 18, 2018 formally terminating the contract effective March 31, 2019, meaning the renewal of that particular media agreement for distribution of WWE's content in its key MENA market was impossible, and forcing the WWE to seek a new media partner for the distribution of its content in the Middle East, which put in serious jeopardy the ability to finalize a media-rights agreement for the MENA region by the end of 2019.

107.    On October 31, 2019, WWE issued a press release providing the Company's third quarter of 2019 ("3Q19") financial results.  The press release stated that the Company's revenues and operating income had continued to decline year over year to $186.3 million and $6.4 million, respectively.  The Company also announced that it was lowering its FY19 adjusted OIBDA guidance to a range of $180 million to $190 million due in large part to WWE's failure to complete a  MENA  distribution  agreement.  *See*  https://corporate.wwe.com/investors/sec-and-other-documents/financials.

108.    On a conference call to discuss the 3Q19 results, Defendant Barrios stated that "no assurances" could be given that the deal would ever be completed.  Further, when analyst, Eric Handler asked Defendant Barrios to clarify whether the MENA deal was still in negotiations, Defendant Barrios swiftly dodged the question:

**Eric Handler- Analyst**

Great. And then with regards to your international deals, you've got the MENA  deal still ongoing in negotiations, and you've got India,      supposedly not finished, you haven't  made any comments there, so we'll assume that there's still need to be done. Can you  maybe talk about, are there any specific bottlenecks that you could point to that has caused these deals to go on longer than expected?

And then with India, their version of the FCC, seemed like they wanted to do some unbundling with sports rights deals. I don't know where that necessarily is, but there was a Cricket deal done about a month ago, which is the first sports deal that I, at   least,   have seen in the last   year. Does that mean at least maybe we could think about India at least – the wheels of progress are starting to churn a little bit more  than they have in the  past several quarters?

**George Barrios- Co-President of WWE**

I don't want to characterize the discussions we're having. I'll continue to stay on India. As we said before, we think we'll have our distribution plan set by the end of the  year –  by the end of this year. And then we've never really talked about a timeline on the MENA region so I'll stay away from that. And as you mentioned before, the regulatory environment in India around Pay TV has been changing over the last several months. Again, I don't want to characterize what that means for us. But like you, we also took notice of that recent announcement on the Cricket rights.

*See*        https://www.fool.com/earnings/call-transcripts/2019/10/31/world-wrestling-entertainment-inc-wwe-q3-2019-earn.aspx.

109.    Defendant Barrios was again pressed about live events in Saudi Arabia by analyst Laura Martin to which he said the following about prospects within Saudi Arabia:

**Laura Martin- Analyst**

Okay. And my last thing is a modeling question. We've now – since we've done a deal with Saudi Arabia, we've done two events a year. Can we just model those in going forward, George, to a year? Is that the right modeling answer?

38

**George Barrios- Co-President of WWE**

> Yes, I can't talk to that right now, Laura, especially around 2020. We said for the reasons I mentioned, we want to talk about 2020 once we've lock down several elements that are still open. So I really can't answer the question.

*Id*.

110.    In both instances, Defendant Barrios breached his fiduciary duties when he willfully omitted pertinent information by refusing to explain the timeline of the MENA deal due.

111.    As reported by *The Wall Street Journal* that evening, Benchmark analyst Mike Hickey stated that "by lowering its outlook now rather than missing fourth-quarter expectations, the company is signaling that it doesn't have a lot of confidence a deal will get done." *See* https://www.wsj.com/articles/world-wrestling-entertainment-shares-fall-on-lower-revenue-delayed-tv-deal-11572546215.

112.    On this news, WWE's stock price fell $10.40 per share or 15.65 % to close at 56.04 per share on October 31, 2019, on unusually high volumes of more than 7.5 million shares traded.

113.    On January 30, 2020, WWE announced that two of its most senior and longest-serving executives, Defendants Barrios and Wilson, had abruptly left the Company. Analysts and market commentators reacted with shock at the sudden loss of two key figures who had long been part of the public face of the Company. For example, *Forbes* described the departures as a "bloodbath" that had caused "[p]anic and uncertainty" throughout WWE's corporate offices." *See* https://www.forbes.com/sites/alfredkonuwa/2020/01/31/wwes-stock-implodes-amid-barrios-and-wilson-firings-uncomfortable-vibe-in-stamford/#490f1a3b1e18.

114.    On this news, WWE's stock price fell $13.42 per share, or 21.54%, to close at $48.88 per share on January 31, 2020, on an unusually high volume of more than 19.4 million shares traded.

115.    Days later, on February 6, 2020, WWE revealed that consumer engagement metrics had continued to fall in the fourth quarter and that the Company had only $180 million in adjusted OBIDA for the year due to the failure to complete the MENA distribution agreement with the Saudis.    *See*    https://corporate.wwe.com/investors/news/press-releases/2020/02-06-2020-132933376.

116.    On an earnings call to discuss the results, WWE's CFO, Frank Riddick, confirmed that the Company's 2020 financial guidance did not include any revenues related to a prospective MENA deal.

117.    On this news, WWE's stock price fell another $4.50 per share, or 9.18%, to close at $44.50 per share on February 6, 2020, on an unusually high volume of more than 15.5 million shares traded.

## DAMAGES TO WWE

118.    As a direct and proximate result of the Individual Defendants' conduct, WWE will lose and expend many millions of dollars.

119.    Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its chief executive officer, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

120.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

121.    As a direct and proximate result of the Director Defendants' conduct, WWE has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount"

that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

123.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

124.    Plaintiff is a current owner of the Company stock and has continuously been owners of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

125.    Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

126.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

127.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

128.    The Company Board is currently comprised of eleven members – McMahon, S. McMahon, Riddick, Levesque, Peterson, Goldfarb, Ong, Singh, Speedy, Wexler, and Gottesman (collectively, the "Directors").   Thus, Plaintiff is required to show that a majority of the

Defendants, *i.e.*, six, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

129.    Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

130.    Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

131.    Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**The Director Defendants Are Not Independent or Disinterested**

**Defendant McMahon**

132.    Defendant McMahon is not disinterested or independent, and therefore, is incapable of considering demand because McMahon (as CEO of the Company) is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

133.    This lack of independence and financial benefits received by McMahon render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

134.    In addition, McMahon is a defendant in the Securities Action, which seeks to hold

him liable for much of the same wrongdoing as is alleged herein.

135.    Moreover, the 2020 Proxy Statement expressly concedes that McMahon is not

independent.

136.    McMahon also sold over 3.2 million Company shares on March 27, 2019, with

only a few days left before the OSN agreement lapsed.

137.    McMahon, as the Company's CEO, Chairman of the Board, and the largest

shareholder has insider information, including but not limited to, actual or constructive

knowledge that the OSN agreement had been terminated early.

138.    He then traded on that inside information by selling a significant stake of his

WWE stock.

139.    As such, Defendant McMahon cannot independently consider any demand to sue

himself for breaching his fiduciary duties to the Company, as that would expose him to

substantial liability and threaten his livelihood.

**Defendant S. McMahon**

140.    Defendant S. McMahon is not disinterested or independent, and therefore, is

incapable of considering demand because S. McMahon (as Chief Brand Officer of the Company)

is an employee who derives substantially all of her wealth and livelihood from her relationship

with the Company, making her not disinterested or independent.

141.    This lack of independence and financial benefits received by S. McMahon render

her incapable of impartially considering a demand to commence and vigorously prosecute this

action.

142.     Additionally, S. McMahon is Defendant McMahon's daughter and Defendant Levesque's wife.  Furthermore, the 2020 Proxy Statement provides that S. McMahon is not independent.

143.     As such, Defendant S. McMahon cannot independently consider any demand to sue herself, her father, or her husband for breaching their fiduciary duties to the Company, as that would expose her and her family members to substantial liability and threaten her livelihood.

**Defendant Levesque**

144.     Defendant Levesque is not disinterested or independent, and therefore, is incapable of considering demand because Levesque (as EVP of Global Talent Strategy & Development of the Company) is an employee who derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

145.     This lack of independence and financial benefits received by Levesque render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

146.     Additionally, Levesque is Defendant McMahon's son-in-law and Defendant S. McMahon's husband.  Furthermore, the 2020 Proxy Statement provides that Levesque is not independent.

147.     As such, Defendant Levesque cannot independently consider any demand to sue himself, his father-in-law, or his wife for breaching their fiduciary duties to the Company, as that would expose him and his family members to substantial liability and threaten his livelihood.

**Defendant Riddick**

148.     Defendant Riddick is not disinterested or independent, and therefore, is incapable of considering demand because Riddick (as Interim CFO of the Company) is an employee who

derives substantially all of his wealth and livelihood from his relationship with the Company, making him not disinterested or independent.

149.     This lack of independence and financial benefits received by Riddick render him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**Defendants Speed, Goldfarb, and Singh**

150.     Defendants Speed, Goldfarb, and Singh served as members of the Audit Committee.  Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements.  Thus, these Defendants were responsible for knowingly or recklessly, allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements.

151.     Defendants Speed, Goldfarb, and Singh breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious disclosure and other deficiencies described herein. Thus, Defendants Speed, Goldfarb, and Singh face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

152.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of WWE's business and affairs.

154.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of WWE.

155.    In breach of their fiduciary duties owed to WWE, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

156.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WWE's securities.

157.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of WWEs securities.

158.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

159.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, WWE has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff on behalf of WWE has no adequate remedy at law.

## <u>SECOND CLAIM</u>

### Against Individual Defendants for Unjust Enrichment

160.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of WWE.

162.   Each of the Defendants received payment from WWE, in the form of either salary or director fees, while actively breaching their fiduciary duties to WWE.

163.   All the payments and benefits provided to Defendants were at the expense of WWE. The Company received no benefit from these payments.

164.   Plaintiff, as a shareholder and a representative of WWE, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of WWE has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Waste of Corporate Assets

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused WWE to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to overpay for WWE's own stock during the portion of the Relevant Period that at least included the period from February 2019 to February 2020, while the stock price was artificially inflated due to the false and misleading statements and omissions that the Individual Defendants made and/or caused the Company to make, and to lose assets from investors and customers who no longer trust the Company.

167.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

168.   Plaintiff on behalf of WWE has no adequate remedy at law.

## **REQUEST FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)      Declaring that the Plaintiff may maintain this action on behalf of WWE, and that Plaintiff is an adequate representative of the Company;

b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to WWE;

c)      Determining and awarding to WWE the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect WWE and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for more significant shareholder input into the policies and guidelines of the board;

2.   a provision to permit the shareholders of WWE to nominate at least four candidates for election to the board; and

49

3.   a proposal to ensure the establishment of effective oversight of compliance
with applicable laws, rules, and regulations.

e)      Awarding  WWE restitution from Individual Defendants, and each of them;

f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable
attorneys' and experts' fees, costs, and expenses; and

g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 14, 2020

**THE PLAINTIFF,**
**RODNEY NORDSTROM, derivatively on**
**behalf of WORLD WRESTLING**
**ENTERTAINMENT, INC.,**

s/Fletcher Moore
Fletcher W. Moore
Justin A. Kuehn (*pro hac vice*)
**Moore Kuehn, PLLC**
30 Wall Street, 8th Floor
New York, NY 10005
Telephone:(212) 709-8245
fmoore@moorekuehn.com

## VERIFICATION

I, Rodney Nordstrom, have reviewed the allegations made in this Verified Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of World Wrestling Entertainment, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___13___ day of August 2020.

*rodney nordstrom*
rodney nordstrom (Aug 13, 2020 22:00 CDT)
RODNEY NORDSTROM